UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HUNTERHEART INC., | Case No. 5:14-cv-04078-LHK |
| Plaintiff, | **ORDER DENYING MOTION FOR PROTECTIVE ORDER** |
| v. | **(Re: Docket No. 59)** |
| BIO-REFERENCE LABORATORIES, INC., | |
| Defendants. | |

Plaintiff HunterHeart Inc. signed a contract that in no uncertain terms sold all its electronic files on its servers to Defendant Bio-Reference Laboratories, Inc. HunterHeart also elected to send other email using those servers even after the sale was complete and after it confirmed that BRLI controlled access to the servers. HunterHeart nevertheless now seeks a protective order restricting BRLI from reviewing certain of those files—emails between HunterHeart CEO Chris Riedel and HunterHeart's attorneys—that are stored on the servers now belonging to BRLI. HunterHeart also asks the court to order BRLI to return these emails. The court DENIES HunterHeart's motion.

**I.**

In 2003, Riedel and his wife Marcia founded Hunter Laboratories, a clinical laboratory testing business.[1] On August 7, 2013, Hunter and BRLI entered into an Asset Purchase Agreement

---
[1] *See* Docket No. 59-2 at ¶ 2.

1
Case No. 5:14-04078-LHK
ORDER DENYING MOTION FOR PROTECTIVE ORDER

by which BRLI bought Hunter's clinical testing laboratory and the bulk of its assets.[2] Among these assets, and explicitly identified in the APA, were all of Hunter's "computer equipment"; "all electronic files, codes, and software stored on said computer equipment"; Hunter's "e-mail addresses" and "other records, data and communications . . . in the cloud."[3] The APA enumerated the email addresses that BRLI had purchased, one of which was Chris Riedel's Hunter email address, "criedel@hunterlabs.com."[4] The agreement permitted Riedel "to have access" to this email address for one year after the closing date.[5] The APA excluded, however, the HunterHeart program, a panel of tests and associated protocols to prevent and manage cardiovascular disease.[6] Hunter renamed itself HunterHeart Inc. and continued to offer the HunterHeart program.[7]

Riedel had used his Hunter email address to communicate with counsel before the sale. Even afterwards, although Hunter had sold BRLI the email address and the server on which the emails were stored, Riedel continued to use that email address to communicate with HunterHeart counsel. In February 2014, Riedel temporarily lost access to that email account during a server migration and asked BRLI, through counsel, to restore it.[8] Regardless, Riedel says he never considered the possibility that BRLI could access these communications,[9] and neither he nor HunterHeart tried to delete or retrieve them. In August 2014, around the time that Riedel lost the right to use the email account under the APA, HunterHeart brought the present suit against BRLI.[10]

---

[2] *See id.* at ¶ 3.

[3] *See* Docket No. 62-3 at § 1.1(a).

[4] *See* Docket No. 62-5.

[5] *See* Docket No. 62-3 at § 8.2(a).

[6] *See* Docket No. 59-2 at ¶¶ 2-3.

[7] *See id.* at ¶ 3.

[8] *See* Docket No. 62-6.

[9] *See* Docket No. 59-2 at ¶ 5; Docket No. 62-4.

[10] *See* Docket No. 2-1.

2

Case No. 5:14-04078-LHK
ORDER DENYING MOTION FOR PROTECTIVE ORDER

1    In July 2015, in the course of responding to HunterHeart's discovery requests for Riedel's
2    emails, BRLI's counsel came across various messages between Riedel and HunterHeart's
3    counsel.[11] BRLI's counsel segregated the emails and notified HunterHeart's counsel that it had
4    them.[12]

## II.

6    This court has jurisdiction under 28 U.S.C. § 1332. The undersigned was assigned
7    discovery matters in this case pursuant to Fed. R. Civ. P. 72(a).

## III.

9    The attorney-client privilege protects from disclosure confidential communications between
10   a client and an attorney.[13] "[It] is intended 'to encourage clients to make full disclosure to their
11   attorneys,' recognizing that sound advice 'depends upon the lawyer's being fully informed by the
12   client.'"[14] "Because it impedes full and free discovery of the truth, the attorney-client privilege is
13   strictly construed."[15] A party waives the attorney-client privilege by tendering voluntarily the
14   contents of a confidential communication.[16] The party asserting the attorney-client privilege bears
15   the burden of showing that it applies.[17] That party also must prove that the privilege has not been
16   waived.[18] The "bare assertion that [a party] did not subjectively intend to waive the privilege is
17   insufficient to make out the necessary element of nonwaiver."[19] Measured against these standards,
18   HunterHeart's request is unwarranted.

---

[11] *See* Docket No. 62-1 at ¶ 18.

[12] *See id.* at ¶ 20.

[13] *See Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010).

[14] *Id.*

[15] *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).

[16] *See id.*

[17] *See id.* at 25.

[18] *See id.*

[19] *Id.*

3
Case No. 5:14-04078-LHK
ORDER DENYING MOTION FOR PROTECTIVE ORDER

*First*, HunterHeart has not met its burden of proving that the attorney-client privilege protects Riedel's communications with counsel before the APA was executed. At the time Riedel made these communications, the attorney-client privilege did attach. Hunter waived that privilege, however, when it agreed to hand over all of its servers, files and communications. HunterHeart argues that California law, which applies in this diversity case,[20] defines waiver as an "intentional relinquishment of a known right."[21] But that is exactly what Hunter did when it executed the APA—it intentionally relinquished its ownership right over all of its communications, and it received consideration in exchange. It is immaterial whether Riedel subjectively anticipated the disclosure of privileged emails. He and Hunter were sophisticated entities who negotiated the APA over the course of several months,[22] and they came to an express agreement to hand over all the communications relevant here. And not until two years after the sale did HunterHeart or Riedel try to remove or retrieve these purportedly privileged communications.

Even if Hunter had not waived its privilege in the APA by express transfer of the disputed communications, it passed from Hunter to BRLI by virtue of the APA's transfer of the other company assets. BRLI cites the instructive case *City of Rialto v. U.S. Dep't of Def.*, where the court held that a purchaser acquiring "substantially all" of a company's assets also acquired the company's attorney-client privilege.[23] Unlike the purchaser in *City of Rialto*, BRLI did not purchase literally all of Hunter's assets—HunterHeart reserved a portion of the business in the form of the HunterHeart program. But the burden of preserving the privilege lies with HunterHeart, and HunterHeart offers insufficient evidence that its sale of all of its tangible assets and nearly all of its intangible ones constituted less than a sale of substantially all of them.

---

[20] *See* Fed. R. Evid. 501.

[21] *Wells Fargo Bank v. Superior Court*, 990 P.2d 591, 597 (Cal. 2000) (quoting *BP Alaska Exploration, Inc. v. Superior Court*, 199 Cal. App. 3d 1240, 1252 (1988)).

[22] *See* Docket No. 62-1 at ¶¶ 3-5.

[23] 492 F. Supp. 2d 1193, 1201 (C.D. Cal. 2007); *see also Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D. 401, 406 (N.D. Ill. 2007) ("[S]everal courts have recognized that assignees or transferees of most, if not all, of a corporation's assets will have the authority to assert or waive the attorney-client privilege.").

***Second***, HunterHeart has failed to show that the attorney-client privilege protects Riedel's communications with counsel after the APA was executed. The privilege never applied in the first instance because Riedel could not have expected these emails to remain confidential. The APA expressly had transferred ownership of Riedel's email account and the server where its contents were stored, and he could continue to use the account only because the APA permitted it. Riedel was aware that BRLI controlled his email account, as evidenced by the fact that he contacted BRLI to restore his access. Also, as above, HunterHeart waived any privilege that may have applied when it agreed to the APA. Like the pre-APA emails, these communications were stored on BRLI servers, and neither Riedel nor HunterHeart ever showed any intention of moving them from that non-confidential location until now.

**SO ORDERED.**

Dated: September 16, 2015

_____
PAUL S. GREWAL
United States Magistrate Judge